IN THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

BOBBY PEARSON, et al.        §
                           §    Civil Action Number: 4-13cv-281-Y
                           §
VS.                        §    Jury Demanded
                           §
TRINITY ARMORED SECURITY, INC., et al.   §

---

**PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT ON DEFENDANTS' MOTOR CARRIER ACT EXEMPTION DEFENSE AND ADMINISTRATIVE EXEMPTION DEFENSE AND PLAINTIFFS' NO EVIDENCE MOTION FOR PARTIAL SUMMARY JUDGMENT ON DEFENDANTS' MOTOR CARRIER ACT EXEMPTION DEFENSE AND GOOD FAITH DEFENSE**

---

# TABLE OF CONTENTS

**Page**

I.  IDENTIFICATION OF LIVE PLEADINGS ................................................. 1

II.  SUMMARY ....................................................................................... 1

III.  STATEMENT OF MATERIAL FACTS NOT IN DISPUTE ......................... 3

IV.  ARGUMENT AND AUTHORITY ............................................................ 6

   A.  Standards for Summary Judgment ............................................... 6

   B.  FLSA Application and Exemptions  Generally ............................... 7

      1.  Application of FLSA to Trinity ................................................ 7

      2.  Application of FLSA to West ................................................... 8

      3.  Exemptions are Narrowly Construed ....................................... 10

   C.  Administrative Exemption ............................................................ 11

      1.  Failure to Plead ..................................................................... 12

      2.  Pearson and Martin Were Not Paid a Salary ........................... 13

   D.  MCA Exemption for Vault Attendants and Drivers ........................ 20

      1.  General Application of MCA Exemption .................................. 20

      2.  Vault Attendants ................................................................... 20

         a.  Job Duties of the Vault Attendants ................................... 20

         b.  Initial Requirements of the MCA Exemption as Applied to Vault
             Attendants .................................................................... 23

         c.  Definition of "Loader" .................................................... 24

         d.  Application of Law to Vault Attendants ............................ 25

         e.  Application of Technical Corrections Act to Vault Attendants ...... 29

i

3.     Drivers .......................................................   30

     a.    The Evolution of the Motor Carrier Act Exemption ...............   30

         i.     The Sate Accountable, Flexible, Efficient Transportation Equity Act: A Legacy of Users, Pub. L. No. 109-59, 119 Stat 1144 (2005) ("SAFETEA-LU") .................................   30

         ii.    The SAFETEA-LU Technical Corrections Act of 2008, Pub. L. No. 110-244, 122 Stat. 1572 (2008) ("TCA") ...............   32

     b.    Plaintiffs are "Covered Employees" Under the TCA .................   33

         i.     The Drivers Satisfy TCA § 306(c)(1) ..........................   34

         ii.    The Drivers Satisfy TCA § 306(c)(2) ..........................   34

         iii.   The Drivers Satisfy TCA § 306(c)(3) ..........................   35

     c.    The Weight of the Vehicles Operated by Plaintiffs .................   35

     d.    Defendants' Argument that the TCA Does Not Apply Fails ...   38

         i.     Courts Holding that the TCA Should Apply .................   38

         ii.    The Opposite View: Courts Holding That the TCA Should Not Apply ......................................................   45

V.    CONCLUSION ..................................................................   47

\*     APPENDIX (separate volume)

## TABLE OF AUTHORITIES

### Cases                                                                          Page

*A.H. Phillips v. Walling,*
    324 U.S. 490 (1945)   …………………………………………………………*10,11*

*Allen v. Coil Tubing Services, L.L.C.,*
    846 F.Supp.2d 678 (S.D. Tex. 2012)   ……………………………… *31, 32, 40-41, 46*

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)   ……………………………………………………….. *6*

*Arnold v. Ben Kanowsky, Inc.,*
    361 U.S. 388 (1960)   …………………………………………………………*10,11*

*Avery v. Chariots for Hire,*
    748 F.Supp.2d 492 (D.Md.2010)   ….…..…………………………………….. *45*

*Barrentine v. Arkansas-Best Freight Sys., Inc.,*
    450 U.S. 728 (1981)   …………..……………………………………… *10*

*Bazan v. Hidalgo Cnty.,*
    246 F.3d 481 (5th Cir. 2001)   …………….………………………………… *6*

*Bedoya v. Aventura Limousine & Transp. Serv., Inc.,*
    No. 11-24432-CIV., 2012 WL 3962935 (S.D. Fla. Sept. 11, 2012)   …..…………*43, 44*

*Benavides v. City of Austin,*
    No. A-11-CV-438-LY, 2013 WL 3197636 (W.D. Tex. June 20, 2013)   ……………… *18*

*Bergquist v. Fidelity Information Services, Inc.,*
    197 F. App'x 813 (11th Cir. 2006)   ……………………………………………*12, 13*

*Botero v. Commonwealth Limousine Serv., Inc.,*
    No. 12-10428-NMG, 2013 WL 3929785 (D. Mass. July 25, 2013)   ……..………*43, 47*

*Brennan v. Texas City Dike & Marina, Inc.,*
    492 F.2d 1115 (5th Cir.), *cert. denied*, 419 U.S. 896 (1974)   …………………… *11*

*Byers v. Dallas Morning News, Inc.,*
    209 F.3d 419 (5th Cir. 2000)   …………….…………………………………... *7*

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)   …………….………………………………………… *7*

iii

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
467 U.S. 837 (1984) ………...……………………………………….. 47

*Citicorp Indus. Credit Corp. v. Brock,*
483 U.S. 27 (1987) ..……………………………………………….. 10

*Collins v. Heritage Wine Cellars, LTD.,*
589 F.3d 895 (7th Cir. 2009) …………………….………………………45-46

*Collins v. Heritage Wine Cellars, LTD.,*
No. 07-CV-1246, 2008 WL 5423550 (N.D.Ill. Dec. 29, 2008) ………………….. 46

*Corning Glass Works v. Brennan,*
417 U.S. 188 (1974) ………………...…………………………….. 12

*Coserv Ltd. Liab. Corp. v. Sw. Bell Tel.,*
350 F.3d 482 (5th Cir. 2003) ……………...…………………………… 34

*Donovan v. Agnew,*
712 F.2d 1509 (1st Cir. 1983) …………….……………………...8, 9

*Donovan v. Grim Hotel Co.,*
747 F.2d 966 (5th Cir.1984) ………………………………………… 8, 9

*Donovan v. Sabine Irrigation Co., Inc.,*
695 F.2d 190 (5th Cir. 1983) ……………………………………... 8

*Falk v. Brennan,*
414 U.S. 190 (1973) …………………….…………………………... 8

*Forsyth v. Barr,*
19 F.3d 1527 (5th Cir. 1994) ……………….…………………... 7

*Garcia v. Western Waste Servs., Inc.,*
No. 1:12-CV-00597-BLW, 2013 WL 4735588 (D. Idaho Sept. 3, 2013) ………... 43, 47

*Gray v. Powers,*
673 F.3d 352 (5th Cir. 2012) ……………….…………………….. 10

*Hernandez v. Alpine Logistics, LLC,*
No. 08-CV-6254T, 2011 WL 38000314 (W.D.N.Y. Aug. 29, 2011) ……………...44, 45

*Hodgson v. Colonnades, Inc.,*
472 F.2d 42 (5th Cir. 1973) …………………………………….11

*Hoffmann-La Roche Inc. v. Sperling,*
493 U.S. 165 (1989) ………………………………………...10

iv

*Idaho Sheet Metal Works, Inc. v. Wirtz*
    383 U.S. 190 (1966) …………………………………………………………*11*

*Jaramillo v. Garda, Inc.,*
    No. 12 C 662, 2012 WL 4955932 (N.D. Ill. Oct. 17, 2012) …………………..*45-46*

*Khan v. IBI Armored Services, Inc.,*
    474 F. Supp. 2d 448 (E.D.N.Y. 2007) …………….………………………...*25, 26*

*Levinson v. Spector Motor Serv.,*
    330 U.S. 649 (1947) ……………….……………………………………..*24*

*Lucas v. United States,*
    807 F.2d 414 (5th Cir. 1986) ………………………………………………… *12*

*Mayan v. Rydbom Express, Inc.,*
    No. Civ.A.07-2658, 2009 WL 3152136 (E.D. Penn. Sept. 30, 2009) ……………...*41, 45*

*McMaster v. Eastern Armored Servs., Inc.,*
    No. 11-5100 (MAS)(TJB), 2013 WL 1288613 (D.N.J. March 26, 2013) ….....................*43*

*Meza v. Intelligent Mexican Mktg., Inc.,*
    720 F.3d 577 (5th Cir. 2013) ………………………………………………… *11*

*Mitchell v. Ky. Fin. Co.*
    359 U.S. 290 (1959) ………...………………………………………… *11*

*Morris v. McComb,*
    332 U.S. 422 (1947) …………...…………………………………………… *24*

*Negri v. Koning & Assocs.,*
    156 Cal. Rptr. 3d 697 (Cal.Ct.App. 2013) ……………….……………………… *18*

*O'Brien v. Lifestyle Transp., Inc.,*
    956 F.Supp.2d 300 (D. Mass. 2013) ……...…………………………………… *44*

*Parker v. ABC Debt Relief, Ltd. Co.,*
    No. 3:10-CV-1332-P, 2013 WL 371573 (N.D. Tex. Jan. 28, 2013) ………...……… *9*

*Pyramid Motor Freight Corp. v. Ispass,*
    330 U.S. 695 (1947) ………………………………………………...*23, 24, 26*

*Sanders–Burns v. City of Plano,*
    594 F.3d 366 (5th Cir. 2010) …………...…………………………………… *7*

*Santana v. Lykes Exclusive, LP,*
    No. 12-22013-CIV, 2013 WL 1001850 (S.D. Fla. Mar. 13, 2013) ……………….. *44*

*Schmidt v. Eagle Waste & Recycling, Inc.,*
    599 F.3d 626 (7th Cir. 2010) …………………………………………....*12, 13*

*Simmons v. City of Ft. Worth, Tex.,*
    805 F.Supp. 419 (N.D.Tex. 1992 ………………………….…………… *11*

*Skotak v. Tenneco Resins, Inc.,*
    953 F.2d 909 (5th Cir. 1992) …………………….………………………… *6*

*Society of Lloyd's v. Turner,*
    303 F.3d 325 (5th Cir. 2002) …………….………………………….. *34*

*Songer v. Dillon Res., Inc.,*
    618 F.3d 467 (5th Cir. 2010) ………………………………………... *23, 31*

*Starcraft Co. v. C.J. Heck Co.,*
    748 F.2d 982 (5th Cir.1984) ………………………………………… *12*

*Torres v. Gristede's Operating Corp.,*
    628 F. Supp. 2d 447 (S.D.N.Y. 2008) ……………………………….*18, 19*

*Vanzzini v. Action Meat Distributors, Inc.,*
    No. CIV.A. H-11-4173, 2014 WL 426494 (S.D. Tex. Jan. 31, 2014) …………*30, 38-39*

*Vela v. City of Hous.,*
    276 F.3d 659 (5th Cir. 2001) …………………………………………….. *7*

*Westberry v. William Joule Marine Transp., Inc.,*
    No. 8:12-CV-486-T-30TGW, 2013 WL 656327 (M.D. Fla. Feb. 22, 2013) ……..… *44*

|  | **Statutes, Regulations &** |  | **Page** |
|---|---|---|---|
|  | **Interpretations** |  |  |

| | | |
|---|---|---|
| 29 U.S.C. § 201 *et seq* | ………………………………………………………….. | 3 |
| 29 U.S.C. § 203 | ………………………………………………………… | 8 |
| 29 U.S.C. § 206 | ………………………………………………………… | 8 |
| 29 U.S.C. § 207 | …………………………………………………………... | 7, 8 |
| 29 U.S.C. § 213 | ………………………………………… | 2, 13, 20, 31, 47 |
| 29 U.S.C. § 216 | …………………………………………………………… | 3, 8 |
| 49 U.S.C. § 13501 | …………………………………………………………. | 31 |
| 49 U.S.C. § 31502 | …………………………………………………………. | 31 |
| 29 C.F.R. § 782.2 | …………………………………………………………... | 23, 31 |
| 29 C.F.R. § 782.5 | …………………………………………………………... | 23-24, 25 |
| 29 C.F.R. § 541.200 | …………………………………………………………. | 13 |
| 29 C.F.R. § 541.602 | …………………………………………………………. | 17 |
| 29 C.F.R. § 541.604 | …………………………………………………………. | 17 |
| 49 C.F.R. § 390.5 | …………………………………………………………. | 32 |
| SAFETEA-LU, Pub. L. No. 109-59, 119 Stat. 1144 (2005) | ……………………………….. | 32, 46 |
| SAFETEA-LU Technical Corrections Act of 2008, Pub. L. 110-244, 122 Stat. 1572 (2008) | …………..…………2, 30, 32, 33, 34, 35, 46 | |
| U.S. Dep't of Labor Wage & Hour Division Fact Sheet #19 | ……………………………………….43, 44 | |
| Wage and Hour Division, U.S. Dep't of Labor, Field Assistance Bulletin No. 2010-2 | ………………………………………41-43, 44 | |

|  | **Rules** | **Page** |
|---|---|---|
| Fed. R. Civ. P. 8 |  | 12 |
| Fed. R. Civ. P. 56 |  | 1, 2, 6 |

# I.

# IDENTIFICATION OF LIVE PLEADINGS

The live pleadings of each party who has appeared in this action are:

A.  Plaintiffs

    a.  With regard to Plaintiffs Bobby Pearson ("**Pearson**"), Frank Spacek, Stefan Marunde, Ky Teumboun, Brennan Andrades, Stephen Whitson, Michael Govantes, Tri Nguyen, Paul Kincade, Craig Richards, Tyrone Jenkins, Mark Harris, Michael Woolsey, James Beetler, Dawn Juarez, Lenard Martin ("**Martin**"), Sam McGee and Chris Pete (collectively referred to as "**Plaintiffs**"), their live pleading is Plaintiffs' First Amended Original Complaint, **Document No. 17**, filed May 7, 2013 (the "**Amended Complaint**").

    b.  Stephen Gutierre's claim has been dismissed.  His live pleading is Rule 54(B) Partial Final Judgment, **Document No. 27**, filed February 5, 2014.

B.  Defendants

    a.  With regard to both Defendant Trinity Armored Security, Inc. ("**Trinity**") and Defendant Kenneth A. West ("**West**"), their live pleading in this case is Defendants' First Amended Answer and Affirmative Defenses, **Document No. 20**, filed July 11, 2013 (the "**Amended Answer**").

# II.

# SUMMARY

Plaintiffs assert claims against Trinity and West (individually "**Defendant**" and collectively "**Defendants**"), for violations of the Fair Labor Standards Act ("**FLSA**") in failing to pay overtime. Plaintiffs file this Motion for Partial Summary Judgment pursuant to Rule 56(a) and 56(c)(1)(A) of the Federal Rules of Civil Procedure with regard to the following issues:

1.  Whether Defendant West is an "employer" under the FLSA;

2.  Whether the "administrative" exemption applies to Plaintiffs Pearson and Martin;

3. Whether the motor carrier act exemption contained in the FLSA, 29 U.S.C. § 213(b)(1), (the "**MCA Exemption**") applies to Vault Attendants (as hereafter defined);

   a. In the alternative, if the MCA Exemption applies to Vault Attendants, whether the SAFETEA–LU Technical Corrections Act of 2008, Pub.L. 110–244, 122 Stat. 1572 (2008) **("TCA")** negates the MCA Exemption in weeks in which the Vault Attendants perform duties affecting the safe operation of vehicles weighing 10,000 pounds or less; and

4. Whether the TCA applies to the Drivers (as hereafter defined) and negates the MCA Exemption in weeks in which the Drivers operate vehicles weighing 10,000 pounds or less.

In addition Plaintiffs file a No-Evidence Motion for Partial Summary Judgment pursuant to Rule 56(c)(1)(B) of the Federal Rules of Civil Procedure on the grounds that Defendants cannot produce admissible evidence to support the facts necessary to establish that:

5. Defendant Trinity is a carrier whose transportation of property by motor vehicle is subject to the Secretary of Transportation's jurisdiction; and

6. Defendants acted in "good faith" and had "reasonable grounds" to believe their actions complied with the FLSA so as to support a possible denial of liquidated damages.

This case involves an armored car security company whose fleet of vehicles consists of 82.5% "**Small Vehicles**" (defined as vehicles weighing 10,000 pounds or less) and 17.5% "**Large Vehicles**" (defined as vehicles weighing greater than 10,000 pounds). [App. 10]. (33 of 40 vehicles are Small Vehicles). In June of 2008, the TCA was passed and carved out an exception to the MCA Exemption. The TCA specifically set forth that, notwithstanding the MCA Exemption, drivers and others who affect the safety of Small Vehicles are to be paid overtime. Plaintiffs contend the TCA negates the MCA Exemption in this case because it is undisputed that certain Plaintiffs drive or otherwise affect the safety of Small Vehicles. Thus, the TCA requires that those Plaintiffs be paid overtime.

This case also involves Plaintiffs who are vault attendants (the "**Vault Attendants**") for the Defendant.  Plaintiffs contend that the vault attendants are not covered by the MCA Exemption because they are not "loaders" and, therefore, they do not come under the jurisdiction of the Secretary of Transportation.

Finally, this case also involves the "administrative" exemption for Plaintiffs Pearson and Martin.  Plaintiffs request the Court to rule that because Pearson and Martin were/are not paid a salary the administrative exemption does not apply.

## III.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

1.     Defendant Trinity provides personalized armored car, ATM, coin sorting and wrapping, and other related services to financial institutions, retail businesses, educational entities and municipalities. It also provides services for events with special scheduling needs such as sports activities and festivals. Defendant Trinity provides these services throughout the North Central Texas region. *See* the Amended Complaint at ¶ 19 [Doc. 17]; the Amended Answer at ¶ 19 [Doc. 20].

2.     Defendant Trinity is an employer covered by the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* (the "FLSA"). *See* the Amended Complaint at ¶ 12 [Doc. 17]; the Amended Answer at ¶ 12 [Doc. 20].

3.     Defendant West is the largest shareholder of Defendant Trinity and owns 27% of the stock of Defendant Trinity. [App. 99-100].

4.     Defendant West is the President and CEO of Defendant Trinity. [App. 100].

5.     Defendant West works at the company every day and is directly involved in the day-to-day business of Defendant Trinity. [App. 101].

6.      As an owner of Defendant Trinity, Defendant West is on the board of directors of Defendant Trinity. [App. 103].

7.      Defendant West has complete say and control over Defendant Trinity's operations and compensation policies and practices. *See* the Amended Complaint at ¶ 21 [Doc. 17]; the Amended Answer at ¶ 21 [Doc. 20].

8.      Defendant West had and has authority to set corporate policy, participate in decisions regarding the classification of employees and the payment of overtime as well as participate in decisions regarding whether or not to pay Plaintiffs overtime.  In addition, Defendant West had and has operational control of significant aspects of the Defendant Trinity's day-to-day functions and independently exercised control over the work situation.   He had and has direct involvement in the day-to-day operation of Defendant Trinity and had and has some direct responsibility for the supervision of the employees.  *See* the Amended Complaint at ¶ 15 [Doc. 17]; the Amended Answer at ¶ 15 [Doc. 20].

9.      Defendant West acts, and has acted, directly or indirectly, in the interests of an employer in relation to Plaintiffs. *See* the Amended Complaint at ¶ 16 [Doc. 17]; the Amended Answer at ¶ 16 [Doc. 20].

10.      Plaintiffs were employed by Defendants within the applicable statute of limitations. *See* the Amended Complaint at ¶ 18 [Doc. 17]; the Amended Answer at ¶ 18 [Doc. 20].

11.      Plaintiffs are paid on an hourly basis. If they work more than 40 hours per workweek they are normally paid only "straight time" for all hours worked over 40; Plaintiffs are not paid time and one half. *See* the Amended Complaint at ¶ 20 [Doc. 17]; the Amended Answer at ¶ 20 [Doc. 20].

12.      Plaintiff Pearson regularly worked in excess of 40 hours a week. *See* the Amended Complaint at ¶ 27 [Doc. 17]; the Amended Answer at ¶ 27 [Doc. 20].

13.     Defendants did not pay Pearson time-and-one-half [his] regular rate of pay for the hours that Pearson worked over 40 hours a week. *See* the Amended Complaint at ¶ 28 [Doc. 17]; the Amended Answer at ¶ 28 [Doc. 20].

14.     The Vault Attendants are paid on an hourly basis but are not paid overtime by Defendants. *See* the Amended Complaint at ¶ 37 [Doc. 17]; the Amended Answer at ¶ 37 [Doc. 20].

15.     The Vault Attendants regularly worked in excess of 40 hours a week. *See* the Amended Complaint at ¶ 38 [Doc. 17]; the Amended Answer at ¶ 38 [Doc. 20].

16.     Defendants did not pay the vault attendants time-and-one-half their regular rate of pay for the hours that the vault attendants worked over 40 hours a week. *See* the Amended Complaint at ¶ 39 [Doc. 17]; the Amended Answer at ¶ 39 [Doc. 20].

17.     The Plaintiffs who are drivers (the "**Drivers**") regularly worked in excess of 40 hours a week. *See* the Amended Complaint at ¶ 54 [Doc. 17]; the Amended Answer at ¶ 54 [Doc. 20].

18.     Defendants did not pay the Drivers time-and-one-half their regular rate of pay for the hours that the drivers worked over 40 hours a week. *See* the Amended Complaint at ¶ 55 [Doc. 17]; the Amended Answer at ¶ 55 [Doc. 20].

19.     Drivers that are normally assigned to a school route drive a truck weighing less than 10,000 pounds 99% of their work time. [App. 132, 148].

20.     Vault attendants do not load cargo on vehicles. [App. 135].

21.     The parties stipulated that, as to vehicle 108, the value specified by the manufacturer on the manufacturer's decal for the Gross Vehicle Weight Rating ("GVWR") reads 9,500 pounds. [App.193].

22.     As their only affirmative defense, Defendants assert that plaintiffs are exempt from the FLSA's overtime premium pay requirements under the MCA Exemption. *See* the Amended

Answer at "First Affirmative Defense" ("The Complaint should be dismissed on the grounds of failure to state a cause of action under which relief may be granted because the practices that are the subject matter of Plaintiffs' complaint concerned employees who [are] exempt from the overtime provisions of the Fair Labor Standards Act under the Motor Carriers exemption.").

23.     Defendants do not plead the affirmative defense of the "administrative" exemption as to Plaintiffs Pearson and/or Martin. *See* the Answer at "First Affirmative Defense."

## IV.
## ARGUMENT & AUTHORITY

### A.  Standards for Summary Judgment

When the record establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," summary judgment is appropriate. Fed. R. Civ. P. 56(a). "[A dispute] is 'genuine' if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001) (citation omitted). A fact is "material" if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To demonstrate that a particular fact cannot be genuinely in dispute, a movant must (a) cite to particular parts of materials in the record (e.g., affidavits, depositions), or (b) show either that (1) the non-movant cannot produce admissible evidence to support that particular fact, or (2) if the non-movant has cited any materials in response, that those materials do not establish the presence of a genuine dispute as to that fact. Fed. R. Civ. P. 56(c)(1). Although the Court is required to consider only the cited materials, it may consider other materials in the record. *See* Fed. R. Civ. P. 56(c)(3). Nevertheless, Rule 56 "does not impose on the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 916 n. 7 (5th Cir. 1992). Instead, parties should "identify specific evidence in the record, and ... articulate the 'precise manner' in which

that evidence support[s] their claim." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994)(citations omitted).

In evaluating whether summary judgment is appropriate, the Court "views the evidence in the light most favorable to the non-movant, drawing all reasonable inferences in the non-movant's favor." *Sanders–Burns v. City of Plano*, 594 F.3d 366, 380 (5th Cir. 2010) (internal quotation marks and citation omitted). "After the non-movant has been given the opportunity to raise a genuine factual [dispute], if no reasonable juror could find for the non-movant, summary judgment will be granted." *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## B.  FLSA Application and Exemptions Generally

The FLSA "establishes the general rule that all employees must receive overtime compensation for hours worked in excess of forty hours during a seven-day workweek." *Vela v. City of Hous.*, 276 F.3d 659, 666 (5th Cir. 2001). Specifically, § 207(a)(1) of the FLSA states:

> Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1).

### 1.  Application of FLSA to Trinity

24.    Defendants admit in their live pleading that, but for the application of an exemption, the elements of Section 207(a)(1) of the FLSA are met by Trinity.  Thus, if an exemption does not apply, Trinity is subject to the provisions of 207(a)(1). *See* the Complaint at ¶ ¶ 11-14, 17-20; the Answer at ¶ ¶ 11-14, 17-20.

## 2.   Application of FLSA to West

Under the FLSA, "any employer" may be liable for violations of the Act. 29 U.S.C. §§ 206, 207, 216(b). An "employer" is "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).[1]

Defendant West has judicially admitted that he is an employer under the FLSA. In the Amended Complaint Plaintiffs allege:

- Defendant West is the owner of Defendant Trinity and has complete say and control over Defendant Trinity's operations and compensation policies and practices. *See* the Amended Complaint ¶ 21 [Doc 17].

- Defendant West had and has authority to set corporate policy, participate in decisions regarding the classification of employees and the payment of overtime as well as participate in decisions regarding whether or not to pay Plaintiffs overtime.  In addition, Defendant West had and has operational control of significant aspects of the Defendant Trinity's day-to-day functions and independently exercised control over the work situation.   He had and has direct involvement in the day-to-day operation of Defendant Trinity and had and has some direct responsibility for the supervision of the employees. *See* the Amended Complaint ¶ 15 [Doc. 17].

- **Defendant West acts, and has acted, directly or indirectly, in the interest of an employer in relation to Plaintiffs.** *See* the Amended Complaint ¶ 16 (emphasis added) [Doc. 17].

- Plaintiffs were employed by Defendants within the applicable statute of limitations. *See* the Amended Complaint ¶ 18 [Doc.17]..

---

[1] This definition is "sufficiently broad to encompass an individual who, though lacking a possessory interest in the 'employer' corporation, effectively dominates its administration or otherwise acts, or has the power to act, on behalf of the corporation vis-a-vis its employees." *Donovan v. Sabine Irrigation Co., Inc.*, 695 F.2d 190, 194-95 (5th Cir. 1983), *abrogated on other grounds by McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 132-34 (1988); *see Donovan v. Grim Hotel Co.*, 747 F.2d 966, 971-72 (5th Cir. 1984) (explaining that "'managerial responsibilities' and substantial control of the terms and conditions of the [employees'] work' create statutory employer status" (quoting *Falk v. Brennan*, 414 U.S. 190, 195 (1973))). Furthermore, "[t]he overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation." *Grim Hotel*, 747 F.2d at 972 (quoting *Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir. 1983)).

Defendant West judicially admitted each of these allegations. *See* the Amended Answer ¶ 21, ¶ 15 , ¶ 16 and ¶ 18 [Doc. 20].

West testified to facts that show his employer status under the FLSA. He testified that he was the largest single shareholder and owned 27% of the stock of the corporate Defendant Trinity. [App. 100]. He testified that he was the president and CEO of the corporation, that he worked every day at the company, and that he was directly involved in the day-to-day business of Trinity. [App. 100]. Additionally, he testified that in order for the Plaintiffs in this lawsuit to have been paid overtime he would have been one of the individuals who would have had to approve that decision [App. 102], and that he was responsible for implementing the pay policy as it presently exists. [App. 104].

Russ Laney, Trinity's Vice President of Administration and part owner, testified that West is basically the one "who ultimately controls all the decisions that are made at Trinity." [App. 130]. Pearson stated in his declaration that West has the power to hire and fire employees. [App. 8]. He also stated that West supervises and controls the employees work schedules and conditions of employment. [App. 8]. He further stated that West determines the compensation for all employees and the manner in which they are compensated. [App. 8]. Finally Pearson stated that West also maintains and controls all of the employment records of the company. [App. 8].

"[A] corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *Donovan v. Grim Hotel Co.*, 747 F.2d 966, 972 (5th Cir.1984) (quoting *Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir. 1983)). A corporate officer with "managerial responsibilities" and "substantial control of the terms and conditions of the [employer's] work" has statutory employer status. *Parker v. ABC Debt Relief, Ltd. Co.*, No. 3:10-CV-1332-P, 2013 WL 371573, at *3 (N.D. Tex. Jan. 28, 2013) (quoting *Grim Hotel*, 747 F.2d at 971).

To determine whether an individual exercises the "operational control" that results in individual employer liability, the Fifth Circuit Court of Appeals calls for consideration of "whether the alleged employer: '(1) possessed the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, (4) maintained employment records.' " *Gray v. Powers*, 673 F.3d 352, 355 (5th Cir. 2012) (citation omitted).  West possessed and exercised each of these powers in the current case.

Defendant West has judicially admitted the ultimate conclusion that he is an employer under the FLSA and the facts necessary to so find.  Additionally, his admissions are supported by the testimony as to his powers and authority.  Thus, this Court should rule he is an employer under the FLSA.

### 3.  Exemptions are Narrowly Construed

The FLSA was designed to ensure "'all our able-bodied working men and women a fair day's pay for a fair day's work.'"  *A.H. Phillips v. Walling*, 324 U.S. 490, 493 (1945) (quoting Message of President Franklin D. Roosevelt to Congress, May 24, 1934); *see also Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981) ("The principal congressional purpose in enacting the . . . [FLSA] was to protect all covered workers from substandard wages and oppressive working hours.").  The Supreme Court has held that this "broad remedial goal of the statute should be enforced to the full extent of its terms."  *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 173 (1989).

To that end, FLSA coverage extends to all workers except those who ***plainly and unmistakably*** fall outside of its ambit.  *See Citicorp Indus. Credit Corp. v. Brock*, 483 U.S. 27, 36 (1987); *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960); *A.H. Phillips*, 324 U.S. at 493 (emphasis added).  Any exemption to FLSA coverage "must . . . be narrowly construed, giving due regard to the plain meaning of statutory language and the intent of Congress."  *A.H. Phillips*, 324 U.S. at 493.

In *Brennan v. Texas City Dike & Marina, Inc.,* 492 F.2d 1115 (5th Cir.), *cert. denied,* 419 U.S. 896, (1974), the Fifth Circuit Court of Appeals echoed these sentiments and stated the well-settled law regarding interpretation of FLSA exemptions:

> The ground rules for interpreting and applying FLSA exemptions disfavor the employer. The Supreme Court has said: To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretative process and frustrate the announced will of the people. *A. H. Phillips, Inc. v. Walling,* 1945, 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095. See *Hodgson v. Colonnades, Inc.,* 5th Cir. 1973, 472 F.2d 42. Therefore we must construe exemptions narrowly against the employer seeking to assert them. *Arnold v. Ben Kanowsky, Inc.,* 1960, 361 U.S. 388, 80 S.Ct. 453, 4 L.Ed.2d 393; *Mitchell v. Kentucky Finance Co.,* 1959, 359 U.S. 290, 79 S.Ct. 756, 3 L.Ed.2d 815; *A. H. Phillips, Inc. v. Walling,* supra. The employer has the burden of proof to show that he is entitled to an exemption. *Idaho Sheet Metal Works, Inc. v. Wirtz,* 1966, 383 U.S. 190, 86 S.Ct. 737, 15 L.Ed.2d 694; *Arnold v. Ben Kanowsky, Inc.,* supra.

*Id.* at 1117.

In *Meza v. Intelligent Mexican Mktg., Inc.,* 720 F.3d 577 (5th Cir. 2013), the Fifth Circuit recently reconfirmed the heavy burden on employers attempting to establish an exemption and stated: "The employer must prove facts by a preponderance of the evidence that show the exemption is 'plainly and unmistakably' applicable." *Id.* at 581 (citing *Arnold,* 361 U.S. at 392*).* Indeed, in *Simmons v. City of Fort Worth, Tex.,* 805 F. Supp. 419 (N.D. Tex. 1992), this Court recognized this well-settled proposition and stated that "exemptions from the minimum wage and overtime provisions of . . . [the FLSA] are narrowly construed against the employer seeking to assert them and applied only to those situations 'plainly and unmistakably within their terms and spirit.'" *Id.* at 423 (citation omitted).

## C. Administrative Exemption

Defendants assert that Pearson and Martin are exempt from the overtime requirements of the FLSA because of the "administrative" exemption. (West Deposition, page 86, lines 13-22).

[App. ]. Defendants' cannot overcome the strong presumption against the administrative exemption for two reasons:

- Defendants did not plead the affirmative defense of the "administrative" exemption; and

- Pearson and Martin were hourly employees who were not paid on a salary basis.

### 1.   Failure to Plead

The "administrative" exemption of the FLSA is an affirmative defense. *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974). As an affirmative defense it must be pled by Defendants. Federal Rule 8(c) requires that an affirmative defense be set forth in a defendant's responsive pleading. Fed. R. Civ. P. 8(c). Failure to comply with this rule "usually results in a waiver." *Lucas v. United States*, 807 F.2d 414, 417 (5th Cir. 1986); *Starcraft Co. v. C.J. Heck Co.*, 748 F.2d 982, 990 n. 11 (5th Cir.1984) (citations omitted).

The affirmative defense of the administrative exemption was not included in either the Defendants' Answer and Affirmative Defenses or Defendants' First Amended Answer and Affirmative Defenses. *See* Defendants' Answer and Affirmative Defenses and Defendants' First Amended Answer and Affirmative Defenses at "First Affirmative Defense." Plaintiffs were prejudiced by the failure of Defendants to plead the affirmative defense as Plaintiffs did not propound any written discovery with regard to such defense. While Plaintiffs' counsel examined West in his deposition on the issue of whether Plaintiffs Pearson and Martin were paid on a salary basis, there was no inquiry into the duties test of the exemption.[2] Thus, Plaintiffs Pearson and

---

[2] The Fifth Circuit has not yet ruled on the precise issue of whether a FLSA exemption affirmative defense is waived if it is not specifically pled in the answer. While other courts of appeals have found that the technical failure to plead an FLSA exemption defense explicitly in the pleadings is not fatal to the employer's ability to assert it in the litigation, *see, e.g., Schmidt v. Eagle Waste & Recycling, Inc.,* 599 F.3d 626, 632 (7th Cir. 2010); *Bergquist v. Fidelity Information Services, Inc.,* 197 F. App'x 813, 815–16 (11th Cir. 2006), in each of those cases the

Martin ask that the Court rule that Defendants' ability to rely on the "administrative" exemption of the FLSA has been waived.

### 2. Pearson and Martin Were Not Paid a Salary

Even if the Court reaches the Defendants' administrative exemption argument, the argument must fail as Plaintiffs Pearson and Martin were not paid a salary.

Minimum wage and maximum hour provisions of the FLSA do not apply to "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). In order to qualify for the administrative exemption, the employee must (1) be compensated **at a salary** of at least $455 per week, (2) have a primary duty of performing "office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," and (3) have a primary duty that includes "the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200 (emphasis added).[3]

It is uncontested that Plaintiffs Pearson and Martin were paid on an hourly basis just like the other workers in this lawsuit. *See* the Amended Complaint at ¶ 20 [Doc. 71]; the Amended Answer at ¶ 20 [Doc. 20]. West admits that Pearson and Martin were paid on an hourly basis and that no guaranteed salary had ever been agreed upon. Specifically, West testified as follows:

> Q.   What – – what is – – what is Mr. Pearson's guaranteed salary?
>
> A.   That's what I said. There are not on a salary. They chose not to do that.
>
> Q.   They are paid hourly, correct?
>
> A.   Uh-huh. At current time.

---

employer made a showing that the respective plaintiffs were not prejudiced by the failure of the employer to plead the affirmative defense. *Schmidt,* 599 F.3d at 632; *Bergquist,* 197 F. App'x at 815-16.   In the current case the Plaintiffs were prejudiced during the discovery process.

[3] Plaintiffs have conducted no discovery on elements two and three of this test because the issues were not raised in Defendants' pleadings.

[App. 110].

West testified that Pearson and Martin's compensation was based on the quantity of hours worked.  [App. 117].  West also testified regarding whether he and Pearson and Martin had agreed on a set amount of compensation that Pearson and Martin would be guaranteed to receive each week. West agreed that no figure had ever been agreed upon between them.

Q.   So did you ever come up with a figure and say that this is the amount of a salary you'll receive?

A.   No. We never got that far, because it was their preference to punch the clock.

Q.   Did you then say, okay, well, you will at least be paid $455 a week?

A.   I don't know that I've ever – – I said that, no.

Q.   Did you tell them that they would be guaranteed a certain amount each week?

A.   I can't say that I did that either, no. The conversation was a long time ago.

Q.   Have you ever given any instructions to any of your payroll processing companies that Mr. Pearson and Mr. Martin are to be paid at least $455 each week?

A.   No. I can't say that we've done that, no.

Q.   Is there any documentation in any of your files that Mr. Pearson and Mr. Martin are to be paid at least $455 each week?

A.   I can't say that that's documented, no.

[App. 118-119].

Next West was specifically asked if he ever told "either Mr. Martin or Mr. Pearson that they would receive a predetermined amount of compensation each pay period?"  West answered, "'No." [App. 119 ].  West admitted that "whatever hours they worked they get paid a straight hourly rate for all those hours." [App. 120].

West conceded that if Pearson and Martin missed work they could be paid if they had "paid time off" days available. West testified that after employees had been with the company a certain period of time the employees were given "paid time off." If, however, the employee had used up all of his/her paid time off they would not be paid for absences from work. This included Pearson and Martin:

Q.      And if the managers aren't there and don't work they don't get paid do they?

A.      That depends on why they're not there. I mean, if they're taking a personal day off then, no.

Q.      And if they take a personal half day off they don't get paid for that time do they?

A.      Not – – not unless they put in for PTO.

        …

Q.      And if they then miss work, including if a manager misses work after their out of paid time off they're not going to get paid for that time are they?

A.      Well, we've never run into that problem.

Q.      **But that's the policy that they wouldn't get paid if they were out of paid time off, correct?**

A.      That would – – if – – if you're hard–lining a policy, **yes, that would be the policy.** But we've never run into that.

[App. 108-109].

In order to provide the Court with specific examples of how Pearson and Martin were compensated, West was asked to use an Excel spreadsheet to demonstrate on an objective basis how Pearson and Martin were compensated.[4] The first spreadsheet, Exhibit 21 to West's Deposition, demonstrated that no matter how many hours Pearson or Martin worked in a week they were simply paid straight time for all of the hours and not paid any additional overtime compensation. [App. 105,

---

[4] West was asked to fill in the blanks in the Exhibits to show the calculations.  The answers are West's handwriting. West Dep. P. 29, l 21-25 [App. 105].

172]. In the example referenced by Exhibit 21, Pearson or Martin would have worked 57 hours and received straight time pay at $15 an hour for a total gross pay of $855 that week. [App. 105, 172 ]. The second spreadsheet, Exhibit 22 to West's Deposition, confirmed that if Pearson and Martin worked only six hours on a particular day they would be paid only for those six hours. *See* entries for Monday and Tuesday on Exhibit 22. [App.106, 173 ]. In the example referenced by Exhibit 22, Pearson and Martin would have worked only 35 hours in the hypothetical week and at $15 an hour received $525 in gross pay that week. [App. 106, 173].

To further establish that Pearson and Martin were not paid a salary and were not guaranteed a predetermined amount of pay each workweek, West was then asked the hypothetical question as to how much Pearson and Martin (or any of the hourly paid managers) would be paid in a given week if they worked only 20 hours that week and were making $15 per hour.  His response, "**300**." [App. 106-107](emphasis added).

Roger McKay, Corporate Operations Manager, also testified that if Plaintiffs Pearson and Martin only worked 20 hours in a week and were being paid $15 an hour, they would only be paid $300 for that week. [App. 155].

The testimony of West and McKay is consistent with the testimony of Pearson and Martin. Pearson and Martin testified that they were paid on an hourly basis and only for the hours worked. [App. 2, 19-20].  Both individuals testified that they were not aware of a predetermined or guaranteed amount of compensation they were to receive each pay period. [App. 2, 19-20]. In fact, Pearson testified that, during negotiations with West regarding his compensation, a set amount as a salary could not be agreed upon so the parties left the compensation on an hourly basis. [App. 2]. Misty Quintanar, the former Human Resources Manager of Trinity, confirmed that there was not a

predetermined or guaranteed amount of compensation that Pearson and Martin were to receive each pay period. [App. 25-26].[5]

The regulations implemented by the Secretary of Labor define when an employee will be considered to be paid on a "salary basis":

> An employee will be considered to be paid on a "salary basis" within the meaning of these regulations if the employee regularly receives each pay period on a weekly, or less frequent basis, a **predetermined** amount constituting all or part of the employee's compensation, which amount is **not subject to reduction because of variations in the quality or quantity of the work performed.**

29 C.F.R. § 541.602(a) (emphasis added).

Pearson and Martin do not meet this test because they did not receive a "predetermined amount" each pay period. To the contrary, the evidence establishes that Pearson's and Martin's compensation was tied directly to and solely dependent on the number of hours they worked.

Plaintiffs recognize that in some circumstances an individual's salary can be computed on an hourly basis and still qualify for an exemption. To do so, however, the employment arrangement must include a "guarantee of at least the minimum weekly required amount." 29 C.F.R. § 541.604 (b).  The regulation states:

> An exempt employee's earnings may be computed on an hourly, a daily or a shift basis, without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes **a guarantee of at least the minimum weekly required amount paid** on a salary basis regardless of the number of hours, days or shifts worked, and a reasonable relationship exists between the guaranteed amount and the amount actually earned.

*Id.* (emphasis added).

Again, Pearson and Martin do not meet this test because there was no "guarantee" of payment to Pearson and Martin.

---

[5] Consistent with the testimony of the parties, Pearson and Martin were not listed in the payroll records as being paid on a "salary." *See* Exhibit 24 to West's Deposition. [App. 192].

Courts have addressed circumstances similar to Pearson's and Martin's.  Those courts have consistently held that the exemption does not apply because the salary test has not been met. For example, in *Benavides v. City of Austin*, No. A-11-CV-438-LY, 2013 WL 3197636 (W.D. Tex. June 20, 2013) the court addressed the jury's finding that the employees were not compensated on a salary basis and stated:

> In summary, the court has thoroughly reviewed the record and can find **no evidence to suggest that Plaintiffs' pay is based on any factor other than the number of hours worked.** Because the jury heard no evidence that Plaintiffs were treated any differently than an hourly employee, there was a "legally sufficient evidentiary basis" for finding the City failed to prove the salary-basis element of its affirmative defense.

*Id* at *6 (citation omitted) (emphasis added).

In a California state court case that was applying the federal definition of "salary basis," the defendant stipulated to the fact that it "never paid [plaintiff] a guaranteed salary" and that if the plaintiff worked fewer claims "he made less money than if he worked more claims."  *Negri v. Koning & Assocs.*, 156 Cal. Rptr. 3d 697, 699, *review denied* 216 Cal. App. 4th 392 (2013).  The court held that the employee was not paid a salary and that the administrative exemption did not apply. *Id.* at 703. The court stated that the stipulations of the defendant were the same thing as saying that the plaintiff was not paid "a predetermined amount." *Id.*

In *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447 (S.D.N.Y. 2008),  the court recognized that it must construe the white collar exemption narrowly against the employer seeking to assert it and ensure that it applies only to those employees plainly and unmistakably within the exemption. *Id.* at 457. The court stated that the overwhelming weight of the evidence suggested just the opposite. *Id.*  The court found that "[defendant's] co– managers and department managers received a regular paycheck that was tied automatically to the amount of hours they worked during the pay period." *Id.*  The court further stated that the defendant's:

> payroll records demonstrate that there was no intention to pay class members a fixed, regular compensation "without regard to the number of days or hours

worked." 29 C.F.R. § 541.602(a). An employee paid on a salary basis should expect to receive regular paychecks with the same number listed in the gross pay column. Though the Secretary's regulations allow for some lawful variations in gross pay regular receipt of payment in a predetermined amount is the hallmark of salaried compensation. *See id.* Here, however, class members frequently received paychecks with a gross pay notation that ranged either above or below the expected compensation for the hours scheduled. That figure was tied directly to the number of hours actually worked.

*Id.*

In each of the above cases the employees were paid on an hourly basis and their pay was computed by multiplying the number of hours worked by their hourly wage. Without any concept of a guarantee or a predetermined amount that the employee would receive on a weekly basis, the exemption did not apply.

The current case is consistent with if not identical to the above cited cases. West admits that Pearson and Martin were not paid a predetermined or guaranteed amount each week. His calculations on the spreadsheets objectively show that Pearson and Martin were simply paid by the hour, regardless of the number of hours worked. **He testified that if the employees only worked 20 hours and were paid $15.00 per hour they would only be paid $300 for that week.** App. 106-07]. This is in no way a guarantee of a pre-determined amount. West even admitted that the payroll processing companies had not been notified to pay any guaranteed amount each week. [App. 118-19]. These facts are not in dispute.

As a matter of law Defendants cannot prove that the administrative exemption "plainly and unmistakably" applies. Plaintiffs should be granted partial summary judgment with regard to this issue.

### D.  MCA Exemption For Vault Attendants and Drivers

#### 1.   General Application of MCA Exemption

In their live pleading, Defendants' sole affirmative defense is that Plaintiffs are exempt from the FLSA's overtime provisions because they are covered by the MCA Exemption.  The MCA Exemption exempts from the overtime pay provisions "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of title 49."  29 U.S.C. § 213(b)(1).

#### 2.   Vault Attendants

The issue before the Court is whether the Vault Attendants are to be considered "loaders" to bring them within the MCA Exemption.  Plaintiffs submit that because the Vault Attendants

- have no responsibility for loading the vehicles;

- do not actually load vehicles;

- do not determine what is to be loaded on vehicles;

- are not present when the vehicles are loaded; and

- do not exercise any judgment and discretion with regard to the loading process,

  they cannot be considered "loaders" and thus not subject to the MCA Exemption.

#### a.  <u>Job Duties of the Vault Attendants</u>

As an armored car security company, Defendant Trinity has a classification of employees who process cargo consisting of cash, currency, checks and other valuables into and out of Trinity's vault.  These individuals are called vault attendants. [App. 14 ]. Plaintiffs who are vault attendants are herein referred to as Vault Attendant(s).

On a daily basis, Trinity's truck drivers pickup cash, currency and other valuables from various locations. For example, pursuant to agreements with the Fort Worth Independent School District ("FWISD") on a daily basis each school route driver on a FWISD route will make pickups from as many as 35 elementary, middle school and high schools. The drivers will pick up cash, checks and other valuables from the schools' cafeterias and vending machines. At the end of the daily route the driver brings the money to Trinity's vault for overnight storage. The next day all of the pickups from the day before from the various FWISD schools are aggregated and delivered to the school district's bank. [App. 17, 19] Simply put, Defendant Trinity uses armed guards to make pickups, stores the money and valuables overnight, aggregates the pickups into a single shipment and the next day delivers that shipment to the bank for deposit.

The Vault Attendants are responsible for checking the cash and valuables into the vault after the driver has completed his route for the day. [App.14]. The Vault Attendants are also responsible for removing the cash and valuables from the vault on the following day and **staging** the cash and valuables to be picked up by a driver. [App. 14] The cash and valuables are the loaded on a vehicle **by the driver** and delivered by the driver to the bank to be deposited. [App. 17] In this regard, the Vault Attendant's job is similar to that of a bank cashier. Both groups of individuals receive valuables from individuals, account for those valuables, store those valuables in a secure place, and deliver those valuables to someone else.  Additionally, Trinity's vault, much like a bank vault, is a secured area to which access is highly controlled. Vault Attendants do not normally leave the controlled access vault area.

The documentation provided to the Vault Attendant (the "**Manifest**") each morning dictates the cargo (cash, coins, currency, etc.) that will be staged by the Vault Attendant. The Vault Attendant, like the cashier, cannot deviate from the instructions contained in the Manifest. [App. 16-17]. To the contrary, Trinity's operations rely on strict adherence with procedures and

documentation. In other words, the correct shipment has to be delivered to the correct location; variances and/or independent judgment is/are not allowed.

The controlled access Vault Area is diagrammed in Exhibit 15 to McKay's Deposition. [App. 17]. The Vault Attendants work in the Vault Area (the darker shaded area located on the right side of the exhibit). The Vault Attendants stage the cargo in the areas identified as Staging Areas one, two and three. [App. 150]. The drivers enter into the Staging Areas from the Secure Areas one, two, and three. The drivers pick up the cargo from the Staging Areas, exit through the Secured Areas and load the cargo on the vehicles. [App. 150-51]. The Vault Attendants do not leave the Vault Area and do not participate in the placing of the cargo in the vehicles.  [App. 151].

The staging of the cargo occurs in one of three ways. First, the Vault Attendants can place coins or currency in a small basket (similar to a hand carried basket in a grocery store) in the Vault Staging Area. [App.15]. Second, the Vault Attendants can place coins or currency in a small utility cart in the Vault Staging Area. [App. 15]. The driver picks up the basket or the cart in the Vault Staging Area, walks through the Secure Area and takes the basket or the cart to the vehicle. [App. 150-51]. The items are then removed from the basket or the cart and loaded in the vehicle by the driver.  [App. 151-52]. The manner in which the cargo is loaded in the basket or the cart by the Vault Attendant makes no difference with regard to how the vehicle is loaded because the cargo is taken out of the basket or the cart by the driver and placed on the vehicle in a location decided solely by the driver. [App. 134].

The final method of staging cargo occurs when Vault Attendants stack coins on a currency skid in the Vault Staging Area.  The Vault Attendants are required to stack the coin skids as directed by the Federal Reserve Bank's loading schematic. [App. 16, 136]. *See* Exhibit 6 to Laney's Deposition. [App. 168].  A copy of the diagram published by the Federal Reserve Bank is posted in the vault area. [App. 153]. The Vault Attendants do not have the latitude to stack the coin skids in

any manner other than as directed by the Federal Reserve Bank. [App. 153]. The driver uses a forklift or a pallet jack to pick up the skid in the Vault Staging Area, walks through the Secure Area and takes the skid to the vehicle. The skid is then loaded in the vehicle by the driver in a location determined solely by the driver. [App. 134-35].

**b.  Initial Requirements of the MCA Exemption as Applied to Vault Attendants**

The first prong of the MCA Exemption requires the employer to be a "carrier whose transportation of . . . property by motor vehicle is subject to" the Secretary of Transportation's jurisdiction. 29 C.F.R. § 782.2(a).   Additionally, the carrier "must be engaged in interstate commerce" to be subject to the Secretary's jurisdiction. *Songer v. Dillon Res., Inc.*, 618 F.3d 467, 472 (5th Cir. 2010). Assuming Defendants can prove the "interstate commerce" requirement **but not admitting they can do so**, Plaintiffs focus on the second prong of the Motor Carrier exemption and allege that as a matter of law it does not apply to the Vault Attendants.   The second prong of the MCA Exemption requires that an employee "engage in activities that directly affect the operational safety of motor vehicles in the transport of property in interstate commerce" as defined by the Motor Carrier Act.  *Songer,* 618 F.3d at 473 (*citing* 29 C.F.R. § 782.2(a)(2)).

In *Pyramid Motor Freight Corp. v. Ispass*, 330 U.S. 695 (1947) the Supreme Court ruled that the jurisdiction of the DOT is limited to employees in the classes of **1) drivers; 2) drivers' helpers; 3) mechanics; and 4) loaders**, and then, only if the activities of the individual employee directly affects the safety of operation of motor vehicles in interstate or foreign commerce.  *Id.* at 706-07. (emphasis added).  These requirements have been codified in the regulations as:

> The exemption is applicable, under decisions of the U.S. Supreme Court, to those employees and those only whose work involves engagement in activities consisting wholly or in part of a class of work which is defined: (i) As that of a **driver, driver's helper, loader, or mechanic**, and (ii) as directly affecting the safety of operation of motor vehicles on the public highways in transportation in interstate or foreign commerce within the meaning of the Motor Carrier Act. *Pyramid Motor Freight Corp. v.*

*Ispass,* 330 U.S. 695; *Levinson v. Spector Motor Service*, 330 U.S. 649; *Morris v. McComb*, 332 U.S. 442.

29 C.F.R. § 782.2(b)(2) (emphasis added).

Plaintiffs submit that because the Vault Attendants (1) have no responsibility for loading the vehicles; and (2) do not, while the vehicle is being loaded, exercise judgment and discretion in planning or building a balance load, they are not considered a "loader" and thus not subject to the MCA Exemption. 29 C.F.R. § 782.5(c).

### c. **Definition of "Loader"**

The fundamental test in establishing whether an employee shall be classified as a "loader," for the purposes of 29 U.S.C. § 213(b)(1), is whether the employee's activities directly affect the safety of operation. *Levinson v. Spector Motor Serv.*, 330 U.S. 649, 660-671 (1947). The federal regulations elaborate on this fundamental test as follows:

> [A]n employee who has no responsibility for the proper loading of a motor vehicle is not within the exemption as a "loader" merely because he furnishes physical assistance when necessary in loading heavy pieces of freight, or because he deposits pieces of freight in the vehicle for someone else to distribute and secure in place, **or even because he does the physical work of arranging pieces of freight in the vehicle where another employee tells him exactly what to do in each instance and he is given no share in the exercise of discretion as to the manner in which the loading is done.**

29 C.F.R. § 782.5(c) (emphasis added).

The regulations implementing the FLSA define a "loader" as follows:

> A "loader," as defined for Motor Carrier Act jurisdiction (Ex parte Nos. MC–2 and MC–3, 28 M.C.C. 125, 133, 134, 139), is an employee of a carrier subject to section 204 of the Motor Carrier Act (other than a driver or driver's helper as defined in §§ 782.3 and 782.4) whose duties include, among other things, **the proper loading of his employer's motor vehicles** so that they may be safely operated on the highways of the country. A "loader" may be called by another name, such as "dockman," "stacker," or "helper," and his duties will usually also include unloading and the transfer of freight between the vehicles and the warehouse, but he engages, as a "loader," in work directly affecting "safety of operation" so long as he has responsibility **when such motor vehicles are being loaded,** for exercising

> judgment and discretion in planning and building a balanced load or in placing, distributing, or securing the pieces of freight in such a manner that the safe operation of the vehicles on the highways in interstate or foreign commerce will not be jeopardized.

29 C.F.R. § 782.5(a) (citations omitted) (emphasis added).  The type of individuals identified in this regulation such as dockman, stacker or helper, are the type of individuals that are present at the vehicle when it is being loaded. They actively take part in the loading process, *i.e.,* physically placing items on vehicles. The language in the regulation addresses activities "when such motor vehicles are being loaded." It cannot apply to the Vault Attendants because the Vault Attendants are in the vault not the loading areas and have no participation in the process "when such motor vehicles are being loaded."

In addition to activities that do qualify as loading, the regulation at 29 CFR § 782.5(c), also identifies common activities that do not constitute "loading."  The regulation states as follows:

> The **mere handling of freight at a terminal**, before or after loading, or even the placing of certain articles of freight on a motor carrier truck may form so trivial, casual, or occasional a part of an employee's activities, or his activities may relate only to such articles or to such limited handling of them, that his activities will not come within the kind of "loading" which directly affects "safety of operation." Thus the following activities have been held to provide no basis for exemption: Unloading; **placing freight in convenient places in the terminal, checking bills of lading**; wheeling or calling freight being loaded or unloaded; loading vehicles for trips which will not involve transportation in interstate or foreign commerce within the meaning of the Motor Carrier Act; and activities relating to the preservation of the freight as distinguished from the safety of operation of the motor vehicles carrying such freight on the highways.

29 C.F.R. § 782.5(c)(citations omitted) (emphasis added).

### d.  <u>Application of Law to Vault Attendants</u>

In a case with a factual setting almost identical to the case currently before this Court and with legal issues that are exactly the same as before this Court, the court in *Khan v. IBI Armored Services,* Inc., 474 F. Supp. 2d 448 (E.D.N.Y. 2007) ruled that the vault attendant was <u>not</u> a "loader"

within the meaning of the Motor Carrier Act and, thus, was entitled to overtime under the FLSA. *Id.*

at 459. In *Kahn* the plaintiff was a vault attendant who worked for an armored car security company.

*Id.* at 453.  His duties, much like the duties of the current Vault Attendants, included receiving cargo

from incoming shipments, placing the incoming cargo bags in bins for further processing by other

vault personnel, and preparing outbound cargo onto wheeled trolleys/bins and skids for checkout

by the outbound drivers. *Id.* at 453-54.  Again, like the current Vault Attendants, Kahn did not

physically load the cargo in a vehicle and had no responsibility for the actual loading of the vehicle.

*Id.* at 455.

In a detailed analysis of the FLSA and the MCA Exemption, the court concluded that Khan

was not a loader. With regard to the issue of preparing pallets for outgoing shipments the court

stated:

> [G]uided by the Supreme Court's admonition in Pyramid that the mere handling of
> freight in a transportation depot does not transform some other kind of cargo
> handling operation into a loading operation for purposes of the Motor Carrier
> Exemption. *Pyramid*, 330 U.S. at 708, 67 S.Ct. 954. From the perspective of the
> objective analysis of his activities that *Pyramid* requires, the placement by Khan of
> outbound cargo onto pallets must be viewed as a "packing" rather than a "loading"
> operation. What Khan did is indistinguishable from what any packager of goods does
> at a factory, warehouse, agricultural field or elsewhere in preparing goods for
> transport by pallet or skid. IBI, to be sure, offers no proof to distinguish Khan's
> duties from the duties of any other type of packer who does not physically load what
> he has packed onto a truck.

*Id.* at 459.[6]

The holding in *Khan* is consistent with the regulations regarding the MCA Exemption and

should be followed in the case before this Court. Such a holding by this Court would also be

consistent with the testimony of the owners and executives of Defendant Trinity. Both Russ Laney

---

[6] In *Pyramid*, the Supreme Court made clear, however, that it had not granted the ICC unlimited power to
regulate anyone whom it deems a "loader." The Court explained that "the mere handling of freight at a
terminal, before or after loading, or even the placing of certain articles of freight on a motor carrier truck may
form so trivial, casual or occasional a part of an employee's activities, or his activities may relate only to such
articles or to such limited handling of them, that his activities will not come within the kind of "loading"
which is described by the Commission and which, in its opinion, affects safety of operation." *Id.* at 708.

and Roger McKay testified that the Vault Attendants do not load the vehicles and do not use discretion in determining the manner in which the vehicles are loaded.  Laney, a part owner of the company, a longtime employee of the company and the vice president responsible for administrative matters for the company, testified as follows:

> Q.   How the trucks are loaded is not up to the vault employee is it?
>
> A.   No, sir.
>
> Q.   That's up to the drivers?
>
> A.   Yes, sir.
>
> Q.   In your opinion, do the vault employees use any discretion in determining how the truck will be loaded?
>
> A.   No.

[App. 135].

McKay is also a part owner of the company, has been employed by the company since 2011, is the Operations Manager and is the person to whom the vault manager reports. McKay testified as follows:

> Q.   So the vault employee has no responsibilities for loading the cargo on the truck; is that correct?
>
> A.   That's correct.
>
> Q.   And the vault employee uses no discretion in how the truck is loaded does he?
>
> A.   No, sir.
>
> Q.   Let me rephrase that. Is it correct that the vault employee does not use discretion when loading the truck when the truck is loaded?
>
> A.   Yes, sir.

[App. 152-53].

Both Laney and McKay also testified that the Vault Attendants have no discretion in the manner in which they build the load. Laney testified that Exhibit 6 to his Deposition was the requirement of the Federal Reserve Bank with regard to how to load a coin skid. [App. 136-37]. He testified that the Vault Attendants must follow those instructions and that the Vault Attendants were required to follow the specific stacking procedure. [App. 136-37]. McKay also testified about the Federal Reserve Bank guidelines and that Vault Attendants do not have discretion as to how to load a coin skid. [App. 153-54]. McKay testified concerning the Vault Attendants lack of discretion regarding cargo to be staged:

> Q.    And when vault employees determine what cargo to stage they look at the manifests for that particular day, correct?
>
> A.    Yes, sir.
>
> Q.    And they are required to pull whatever cargo the manifest lists for that route aren't they?
>
> A.    Yes, sir.
>
> Q.    And they can only stage that cargo for that route, correct?
>
> A.    Yes, sir.
>
> Q.    And they are not free to say we're going to add additional cargo to what the manifest calls for are they?
>
> A.    No, sir.
>
> Q.    And, in fact, it's money and currency that you're dealing with, so that would be strictly prohibited, correct?
>
> A.    Yes, sir.

Q.    So do vault employees use discretion in determining what is to be staged cargo – wise?

A.    No, sir.

Q.    And who tells them what to stage? The paperwork, is that what tells them?

A.    The paperwork, yes, sir.

[App. 156-57].

Compare this description with the bank cashier.  The bank cashier does not determine how the security driver will load his/her trucks when the security driver leaves the bank with the money the bank cashier gave or "stage" for him/her.  Neither do the Vault Attendants.   Both the cashier and the Vault Attendants in effect tell the drivers, "Here is the cargo.  How you load it and transport it is up to you."

Additionally, both Laney and McKay testified that they believe the vault employees should be receiving overtime. [App. 131, 149].

Given the undisputed facts that the Vault Attendants are not loaders, summary judgment is appropriate with regard to the MCA Exemption.

### e.    Application of Technical Corrections Act to Vault Attendants

In the unlikely event the Court determines that the Vault Attendants are "loaders" and would qualify for the MCA exemption, the TCA negates the exemption and entitles the Vault Attendants to overtime under the FLSA. (See detailed discussion of TCA below regarding the Plaintiffs who are drivers).

On a daily basis the Vault Attendants stage cargo to be loaded on vehicles weighing 10,000 pounds or less and with a GVWR of 10,000 pounds or less. [App. 18].[7] Thus, even if the Vault Attendants are determined to be "loaders" Plaintiffs are entitled to summary judgment on the issue of liability for the Vault Attendants pursuant to the TCA.

### 3. Drivers

Plaintiffs assert that the TCA requires that the Plaintiffs who are drivers (the "**Drivers**") in this case be paid overtime.

The TCA made significant alterations to the MCA Exemption. *See generally* Pub. L. No. 110-244, §§ 305, 306, 122 Stat. 1572, 1619-21. Specifically, the TCA provided that the FLSA's overtime pay requirements "shall apply" to a "covered employee" **notwithstanding the MCA Exemption**. *Id.* § 306(a), 122 Stat. at 1620 (emphasis added).  Thus, the TCA narrowed the scope of the MCA Exemption.  *See, Vanzzini v. Action Meat Distributors, Inc.,* No. CIV.A. H-11-4173, 2014 WL 426494, at *6 (S.D. Tex. Jan. 31, 2014).  The result is that following the enactment of the TCA "an employee of a motor carrier or a motor private carrier who works with motor vehicles weighing less than 10,000 pounds may be entitled to overtime compensation as provided in the FLSA." *Id.* at *4.[8]

Because all of the Drivers in the current action are "covered employees" for purposes of the TCA, each of them is entitled to overtime under the FLSA.

### a.  The Evolution of the Motor Carrier Act Exemption

As enacted in 1935, and until recent legislation, the MCA Exemption provided that the FLSA's overtime requirement "shall not apply ... to ... any employee with respect to whom the

---

[7] Vehicles 107, 108, 112, and 113 are Small Vehicles. [App. 18] *See,* Exhibit 1 to Pearson Declaration [App. 10].

[8] While the court in *Vanzzini* quoted the TCA as applicable to vehicles "weighing less than 10,000 pounds" the Act actually applies to vehicles "weighing 10,000 or less."  That one pound distinction is not material to any issue in this case. *Vanzzini* at *6.

[United States] Secretary of Transportation has power to establish qualifications and maximum hours of service ....” 29 U.S.C. § 213(b)(1).  *Songer v. Dillon Res., Inc.*, 618 F.3d 467, 472 (5th Cir. 2010); *Allen v. Coil Tubing Services, L.L.C.*, 846 F.Supp.2d 678, 689 (S.D. Tex. 2012).  Under 49 U.S.C. §31502, the Secretary of Transportation is authorized to “prescribe requirements for qualifications and maximum hours of service of” a motor carrier or a private motor carrier.   49 U.S.C. §31502(b)(1)-(2).  It is specifically stated in 49 U.S.C. §31502(a)(1) that this includes “transportation” as described in 49 U.S.C. §13501.  *Id.* at §31502(a)(1).  Thus, 49 U.S.C. §13501 confers jurisdiction on the Secretary of Transportation over transportation by a motor carrier “on a public highway,” to the extent passengers, property, or both are transported by a motor carrier between states.  *See id.* at §13501(1)-(2).

Application of the MCA Exemption to an employee “depends both on the class to which his employer belongs and on the class of work involved in the employee's job.” 29 C.F.R. § 782.2(a). The DOT has the power to establish maximum hours and qualifications to those employees who:

> (1) [a]re employed by carriers whose transportation of passengers or property by motor vehicle is subject to his jurisdiction under section 204 of the Motor Carrier Act [codified at 49 U.S.C. § 31502] ..., *and*
>
> (2) engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act.

*Id.* (emphasis added).  Thus, “[h]istorically, when the DOT had jurisdiction over a motor carrier, the FLSA did not apply to certain transportation safety-related employees of the motor carrier. *See generally*, 29 C.F.R. § 782.2 *et seq.” Allen,* 846 F.Supp.2d at 690.

### i.   *The Safe Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users, Pub. L. No. 109–59, 119 Stat. 1144 (2005) ("SAFETEA–LU").*

On August 10, 2005, Congress passed the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users, Pub. L. No. 109–59, §4142, 119 Stat. 1144 (2005) (**"SAFETEA–LU"**). This act limited the DOT's authority by defining the term "motor carrier" to mean "a person providing commercial motor vehicle ... transportation for compensation." *Id.*  A commercial motor vehicle was defined as a vehicle with "a gross vehicle weight rating or gross combination weight rating, or gross vehicle weight or gross combination weight, of (10,001 pounds) or more, whichever is greater." 49 C.F.R. § 390.5. The effect of the passage of SAFETEA-LU, for purposes of the MCA Exemption, was that an employee did not fall under the MCA Exemption unless he worked with vehicles weighing 10,001 pounds or more.[9]

### ii.   *The SAFETEA–LU Technical Corrections Act of 2008, Pub. L. No. 110–244, 122 Stat. 1572 (2008) ("TCA")*

On June 6, 2008, Congress passed the TCA. The TCA restored the previous definition of "motor carrier" by replacing "commercial motor vehicle" with "motor vehicle." *Id.* § 305(c), 122 Stat. at 1620. "This change accordingly expanded the reach of the DOT's authority to cover again all employers that operated "motor vehicles" of any weight. This amendment restored the DOT's regulatory jurisdiction to its pre-SAFETEA-LU scope." *Allen,* 846 F.Supp.2d at 692.   However, the TCA (specifically Section 306 of the TCA entitled "Applicability of the Fair Labor Standards Act Requirement and Limitation on Liability") also made significant alterations to the MCA Exemption. In particular, Section 306(a) provides that:  "Beginning on the date of enactment of this Act, section

---

[9] Except for the purpose of providing background information, the SAFETEA-LU provisions are not relevant to the case before the Court because the cause of action of all of the Plaintiffs arose after the enactment of the TCA. It is the provisions of the TCA that are dispositive of the issues before the Court.

7 of the Fair Labor Standards Act of 1938 (29 U.S.C. 207) shall apply to a ***covered employee*** notwithstanding section 13(b)(1) of that Act (29 U.S.C. § 213(B)(1))." *Id.* § 306(a), 122 Stat. at 1620 (emphasis added).  Section 306(c) of the TCA defines a "covered employee" as follows:

> COVERED EMPLOYEE DEFINED. – In this section, the term "***covered employee***" means an individual –
>
> (1) who is employed by a motor carrier or motor private carrier (as such terms are defined by section 13102 of title 49, United States Code, as amended by section 305);
>
> (2) whose work, ***in whole or in part***, is defined –
>
>> (A) as that of a driver, driver's helper, loader, or mechanic; and
>>
>> (B) ***as affecting the safety of operation of motor vehicles weighing 10,000 pounds or less*** in transportation on public highways in interstate or foreign commerce, except vehicles –
>>
>>> (i) designed or used to transport more than 8 passengers (including the driver) for compensation;
>>>
>>> (ii) designed or used to transport more than 15 passengers (including the driver) and not used to transport passengers for compensation; or
>>>
>>> (iii) used in transporting material found by the Secretary of Transportation to be hazardous under section 5103 of title 49, United States Code, and transported in a quantity requiring placarding under regulations prescribed by the Secretary under section 5103 of title 49, United States Code; and
>
> (3) who performs duties on motor vehicles weighing 10,000 pounds or less.

*Id.* § 306(c), 122 Stat. at 1621 (emphasis added).

## b.  Plaintiffs are "Covered Employees" Under the Technical Corrections Act

Given the plain language of the TCA, Plaintiffs submit that the dispositive question now before the Court is whether Plaintiffs are "covered employees" under the TCA. If so, the TCA requires them to be paid overtime during all weeks in which they operate vehicles weighing 10,000 pounds or less. It is a cardinal rule of statutory interpretation that the starting point of any statutory

analysis is the plain language of the statute. *See Coserv Ltd. Liab. Corp. v. Sw. Bell Tel. Co.,* 350 F.3d 482,486 (5th Cir. 2003); *Society of Lloyd's v. Turner,* 303 F.3d 325, 330 (5th Cir. 2002).    Thus, the plaintiffs will address each of the three requirements of the TCA to prove their status as "covered employees" and entitlement to overtime.

### i.   The Drivers Satisfy TCA § 306(c)(1)

Section § 306(c)(1) of the TCA requires that an individual be "employed by a motor carrier or motor private carrier (as such terms are defined by section 13102 of title 49, United States Code, as amended by section 305)." *Id.* § 306(c)(1), 122 Stat. at 1621.  [App.    ].  It is assumed that Defendants will prove this fact since Defendant Trinity's status as a "motor carrier" or "private motor carrier" is required for it to invoke the affirmative defense of MCA Exemption.[10]

### ii.   The Drivers Satisfy TCA § 306(c)(2)

Section § 306(c)(2) of the TCA requires that an individual's "work, **in whole or in part,** is defined – (A) as that of a driver, driver's helper, loader, or mechanic; and (B) as affecting the safety of operation of motor vehicles weighing 10,000 pounds or less in transportation on public highways in interstate or foreign commerce." *Id.* § 306(c)(2), 122 Stat. at 1621 (emphasis added).  [App.90-91]. The Drivers satisfy this requirement.

First, with respect to TCA § 306(c)(2)(A), the duties of all of the Driver's include driving a vehicle.  As such, the Driver's work, "in whole or in part, is defined as . . . that of a driver." *Id.*

Second, with respect to Technical Corrections Act § 306(c)(2)(B), the evidence establishes that each of the Plaintiffs who are Drivers drove and operated motor vehicles weighing less than

---

[10] While it is assumed for purposes of the TCA analysis that Defendants will prove it is a carrier whose transportation of property by motor vehicle is subject to the Secretary of Transportation's jurisdiction, Plaintiffs do not concede this fact.  If Defendants do not prove such fact, the case is over as the MCA Exemption will not apply and there will be no need to analyze the TCA.

10,000 pounds during their employment by Defendants.    See, Driving Records and Vehicle Summary [App. 195-262].

### *iii. The Drivers Satisfy Technical Corrections Act § 306(c)(3)*

TCA § 306(c)(3) requires that an individual "performs duties on motor vehicles weighing 10,000 pounds or less." *Id.* § 306(c)(3), 122 Stat. at 1621.  This requirement is easily satisfied, since as explained below the Drivers are performing duties on motor vehicles weighing 10,000 pounds or less during their employment by Defendants.

### c.  <u>The Weight of the Vehicles Operated by the Plaintiffs</u>

As stated earlier, 82.5% of the vehicles operated by Trinity have a GVWR and an actual weight of 10,000 pounds or less. [App. 10]. These vehicles are referred to herein as "Small Vehicles." Also as earlier stated, 17.5% of the vehicles operated by Trinity have a GVWR and an actual weight of greater than 10,000 pounds. [App. 10]. These vehicles are referred to herein as "Large Vehicles."

The Small Vehicles include all of the non-armored vehicles (Chevy Van, Scion XB, Chevy HHR 4 DR, Ford Transit Conn, Ford Escape, and Ford Focus) and some of the smaller armored vehicles. [App. 3, 10].[11]  The armored vehicles that are Large Vehicles are vehicles numbers 103, 104, 105, 107 (after July 2012), 111, and 137. [App. 4].

Attached to the Declaration of Pearson is a chart [App. 10] showing the various vehicles operated by Trinity and whether they are a Small Vehicle or a Large Vehicle.  *See* Exhibit A to Pearson Declaration.  [App. 4, 10].

---

[11] The smaller armored vehicles that have a GVWR and an actual weight of 10,000 pounds or less are vehicles 21, 22, 107 (prior to July 2012), 108, 110, 112, 113, 114 and 136. [App. 3].  Each of those vehicles is built on the same chassis. [App. 3].

Exhibit number 25 to West's deposition is a print out from Ford's Fleet Internet site showing the specifications for each of vehicles numbers 21, 22, 108, 110, 112, 113, 114 and 136. The exhibit confirms that the GVWR range for each of the vehicles is between 6,001 and 10,000 pounds. [App. 184-91].

West's testimony is consistent with the chart and Ford internet site. West testified that the GVWR of vehicles number 21, 22, 108, 110, 112, 113, 114 and 136 is less than 10,000 pounds. [[App. 113-14]. He also testified that the actual weight of vehicles 21, 22, 108, 110, 112, 113, 114 and 136 was 10,000 pounds or less.

> Q.    Okay. So if we use the actual weight, or the single number posted by the manufacturer for the gross vehicle weight rating, all of these trucks that I mentioned, 21, 22, 108, 110, 112, 113 and 114 and 136 are going to be 10,000 pounds or less, correct?
>
> A.    State the first part of your question again. I'm sorry.
>
> Q.    If you use either the actual weight, or the manufacturer's singled number of gross vehicle weight rating that they post, it's going to be 10,000 pounds or less?
>
> A.    The actual weight of the truck?
>
> Q.    Yes.
>
> A.    Yes. The actual weight the truck is less than 10,000 pounds, yes.

[App. 115].

While all of the drivers drove Small Vehicles, the percentage of time varies by Plaintiff. Drivers who drove mainly on the "school routes,"[12] (a route that does not require an armored vehicle) drove Small Vehicles 99% of the time. [App. 132].

---

[12] Stefan Marunde, Stephan Whitson (before he moved to the Vault), Tyrone Jenkins, Mark Harris, James Beetler, Chris Pete, Frank Spacek (before he moved to the vault) and Paul Kincade (before he moved to the vault). [App. 5].

With regard to the Plaintiffs that mainly drove routes that required an armored vehicle, some of the time they were in an armored vehicle that was a Small Vehicle and some of the time they were in an armored vehicle that was a Large Vehicle.  The records of the vehicles driven by the Plaintiffs[13] who mainly drove armored vehicles are in the Appendix at 201-260. Also in the appendix is a chart detailing the following information:

| Driver | Small Vehicle % | Large Vehicle % |
|--------|-----------------|-----------------|
| Teumboun | 97.9% | 2.1% |
| McGee | 96.6% | 3.4% |
| Andrades | 67.9% | 32.1% |
| Woolsey | 64.5% | 35.5% |
| Richards | 57.2% | 42.8% |
| Nguyen | 21.1% | 78.9% |
| Combined Total | 69% | 31% |

[App. 195-262 ].

What does the chart establish and how does it help the Court?  First, the chart establishes that this is **not** a company where the Plaintiffs predominately drive Large Vehicles but every now and then also drive a Small Vehicle. To the contrary, the chart establishes that the Plaintiff Drivers (other than Nguyen) spend an overwhelming majority of their time in Small Vehicles.

---

[13] Ky Teumboun, Brennan Andrades, Tri Nguyen, Craig Richards, Mike Woolsey and Sam McGee. [App. 6].

Because the Drivers satisfy all of the requirements of TCA and meet the "covered employee" definition, the MCA Exemption to the FLSA's overtime pay requirement is not applicable to them.

### d. **Defendants' Argument that the Technical Corrections Act Does Not Apply Fails**

Given the plain language of the TCA and the undisputed facts that the Plaintiffs operate vehicles weighing 10,000 pounds or less, Defendants only escape route is to allege that the TCA does not apply to their company. This argument flies in the face of the rules of statutory construction and the decisions of the majority of the courts that have addressed the issue.

### i. *Courts Holding That the TCA Should Apply*

Neither the Fifth Circuit nor any district court in the Northern District of Texas has addressed the TCA with regard to the FLSA. Courts in the Southern District of Texas, however, have addressed the issue and unanimously supported the holding that even though employees may at times operate vehicles weighing greater than 10,000 pounds, as long as they also operate vehicles weighing 10,000 pounds or less, they are entitled to overtime compensation.

Most recently, in *Vanzzini v. Action Meat Distributors, Inc.,* No. CIV.A. H-11-4173, 2014 WL 426494 (S.D. Tex. Jan. 31, 2014), Judge Keith Ellison addressed a situation in which the defendant claimed the MCA Exemption. The defendant alleged that all of its trucks weighed more than 10,001 pounds. The court stated that if such allegation was true then the drivers "fall squarely into the MCA Exemption." *Id.* at *7.

The court explained the evolution of the MCA Exemption and addressed SAFETEA-LU and the TCA. *Id.* at *5-7. Then, with respect to the claims of each of the plaintiffs who could not prove that they drove a vehicle weighing 10,000 pounds or less, the court granted the defendant's motion for summary judgment because of the MCA Exemption. *Id.* at *8. **The court, however,**

**refused to dismiss the claim of the single plaintiff who presented evidence that he at times operated a vehicle weighing 10,000 pounds or less.** *Id.*

The plaintiff testified that his supervisor would "occasionally" ask him to use the supervisor's personal truck for business-related matters. The court ruled that because there was evidence the plaintiff had been given an assignment to complete "a business-related task" using the supervisor's personal vehicle (which defendants did not dispute weighed less than 10,000 pounds), summary judgment in favor of the defendants as to the applicability of the MCA Exemption for that particular plaintiff was denied. *Id.* With regard to the TCA the court stated:

> [T]he TCA both restored the scope of the Secretary of Transportation's regulatory jurisdiction to what it was prior to the enactment of SAFETEA–LU, and **simultaneously narrowed the scope of the MCA exemption.** The result is that, following SAFETEA–LU and the TCA, an employee of a motor carrier or a motor private carrier who works with motor vehicles weighing less than 10,000 pounds may be entitled to overtime compensation as provided in the FLSA.

*Id. at *6* (emphasis added).

The ruling of the court in *Vanzzini* should be instructive in the current case.  In *Vanzzini*, although the plaintiff (against whom summary judgment was denied) drove both Large Vehicles and Small Vehicles, the facts were much more favorable to the employer than in the case before this Court. The testimony in *Vanzzini* was that the supervisor would "occasionally" ask an employee to use his personal truck for business-related matters. *Id* at *8. The court ruled that it could be inferred that the plaintiff "may have been given **an** assignment to complete **a** business-related task" using the supervisor's personal vehicle and; thus, the applicability of the MCA Exemption was denied. *Id.* (emphasis added).

In the current case, the Plaintiff Drivers operated Small Vehicles more than they operated Large Vehicles. In fact, the school route drivers operated Small Vehicles 99% of their work time. McKay Depo, p 21 l 1-5 [App. ]. If a single use in *Vanzzini* or, at most, an occasional use of a Small

Vehicle can negate the MCA Exemption, the Court in the current case should have no trouble likewise denying the MCA Exemption to Defendants.

    *Allen v. Coil Tubing Service, L.L.C.* 846 F. Supp. 2d 678 (S.D. Tex. 2012) is another case from the Southern District of Texas that addresses the TCA. In *Allen*, the plaintiffs appear to allege that even though they worked on large Vehicles (see description of vehicles at *Allen* footnotes 11, 14 and 15) they also worked on Small Vehicles. The court first addressed the affect of the TCA on the MCA Exemption. The court stated:

> The TCA provided also, however, that "section 7 of the [FLSA] shall apply to a covered employee notwithstanding section 13(b)(1) of that Act [the MCA Exemption]." Id. § 306(a), 122 Stat. 1572, 1620 (referring to 29 U.S.C. §§ 207, 213(b)(1)). This change thus narrowed the range of employees who were covered by the MCA Exemption. *Mayan*, 2009 WL 3152136, at *9. By this provision, Congress broke with its legislative tradition pursuant to which expansion of the DOT's jurisdiction concomitantly narrowed the reach of the DOL's authority and thus the applicability of FLSA overtime provisions. Notwithstanding the MCA Exemption, under the TCA, the FLSA's overtime provisions now apply to any "covered employee" as defined in section 306. Pub.L. 110–244, § 306(a), (c), 122 Stat. 1572, 1620–21;  *693 Mayan*, 2009 WL 3152136, at *9.25 In substance, under the TCA, an employee of a motor carrier or motor private carrier (such as CTS) who works with "non-commercial motor vehicles" defined as vehicles weighing 10,000 pounds or less may now be entitled to overtime compensation. Id. § 306(a), (c), 122 Stat. 1572, 1620–21; *Mayan*, 2009 WL 3152136, at *9

*Allen,* 846 F.Supp.2d at 692-93.

    The court addressed the claims that arose prior to the enactment of the TCA. Those claims were denied as exempt by the Motor Carrier Act.  With regard to the claims that arose after the enactment of the TCA, the court stated that it did not have sufficient evidence as to how often each plaintiff individually performed duties with vehicles weighing 10,000 pounds or less.

    The court, however, recognized that the TCA now allows employees who had previously been exempt under the MCA Exemption to recover overtime if they worked with Small Vehicles. The court stated:

Thus, under the TCA, an employee who works for a DOT-regulated motor carrier or motor private carrier (such as CTS) and works on or with non-commercial motor vehicles (i.e., vehicles weighing 10,000 pounds or less) may now be entitled to overtime compensation. See *Mayan*, 2009 WL 3152136, at *9. **To be entitled to overtime pay, an employee must perform some meaningful work for more than an insubstantial time with vehicles weighing 10,000 pounds or less.** The parties have not provided sufficient evidence concerning the Bellwether Plaintiffs' use (or non-use) of non-commercial vehicles. There remain fact issues precluding summary judgment for this time period.

*Id.* at 705 (emphasis added).

The manner in which the TCA was applied by these Southern District of Texas courts and the manner in which Plaintiffs request this Court to apply the TCA is supported by the Department of Labor. *See,* Wage and Hour Division, U. S. Dep't of Labor, Field Assistance Bulletin No. 2010-2 (the "**Field Assistance Bulletin**").  The Field Assistance Bulletin specifically provides in part as follows:

> Prior to TCA's enactment, drivers, driver's helpers, loaders or mechanics who performed safety affecting duties on commercial motor vehicles under SAFETEA-LU were exempt under § 13(b)(1) for four months from the time they actually engaged in the carrier's interstate activities, or from the time they could have been called upon to engage in the carrier's interstate activities. **TCA overrides the application of the "four-month" rule in any workweek an employee is covered by section 306(c).**
>
> . . .
>
> For example, employees who performed, or could have been called upon to perform, duties affecting the safe operation of a motor vehicle in interstate commerce in any workweek are exempt from FLSA overtime requirements for the next four months, **except** for workweeks in that period in which their duties, in whole or in part, affect the safe operation of a small vehicle in interstate commerce. [emphasis in original] The phrase "in whole or in part" included in the statute means **an employee who performs such duties involving small vehicles for the entire week or part of the week must receive overtime pay for hours worked over 40 in that workweek.** The changes made by TCA thus extend FLSA overtime protection to some employees **even when such employees are also subject to the authority of the Secretary of Transportation to set maximum hours of service.** Please see attached chart for further clarification on how the TCA affects the application of the 13(b)(I) exemption.

*Id.* (emphasis added) [App. 165].

The Chart referenced by the Department of Labor in the Field Assistance Bulletin specifically describes the situation at Trinity and before this Court. The chart is as follows:

| DRIVER, DRIVER'S HELPER, LOADER OR MECHANIC WHOSE WORK AFFECTS THE SAFE OPERATION OF MOTOR VEHICLES ON PUBLIC HIGHWAYS IN INTERSTATE OR FOREIGN COMMERCE AND PERFORMS SUCH DUTIES ON THE FOLLOWING VEHICLES: | TCA & FLSA § 13(B)(1) EXEMPT OR NONEXEMPT STATUS |
|---|---|
| | |
| E. On a motor vehicle that weighs 10,001 pounds or more; however, in some workweeks (whether the entire week or part of the week), also performs safety affecting duties on a motor vehicle that weighs 10,000 pounds or less (referred to as a "small vehicle"). | Nonexempt in those workweeks where work is also performed on a vehicle that weighs 10,000 pounds or less (small vehicle); four – month rule may apply in other work weeks. |

[App. 166]. The Department of Labor also gave a specific example to assure there was no misunderstanding of it guidance:

For example:

An employer employs a pool of drivers, anyone of whom could be called upon to drive a truck weighing 10,001 pounds or more to transport materials to a construction site in another state. If a driver is called to drive the truck to the construction site, that driver along with the other drivers who could have been called upon to drive are exempt from overtime pay for the following four months, as described in A above.

However, if a driver in any workweek during the four months performs safety affecting duties on a vehicle that weighs 10,000 pounds or less ("small vehicle"), that driver alone is nonexempt for that workweek and must receive overtime pay for hours worked over 40, as described in E above.

Department of Labor, Wage & Hour Division Field Assistance Bulletin 2010-2. [App. 166][14]

A recent case involving an armored car company that is right on point with the case before the Court found that TCA applies to armored car drivers who operate both Small Vehicles and Large Vehicles. *See, McMaster v. Eastern Armored Servs., Inc.,* No. 11-5100 (MAS)(TJB), 2013 WL 1288613, at *4-5 (D.N.J. March 26, 2013). In *McMaster,* the Plaintiff was an armored car driver who drove Small Vehicles 49% of the time and Large Vehicles 51% of the time. The court analyzed the TCA and the decisions from courts that had addressed it in Small Vehicle/Large Vehicle cases. The Court ruled that the TCA clearly defined the plaintiff as a covered employee. It stated, "It is embedded in the very definition of 'covered employee' that an employee's work need only involve the operation of non-commercial vehicles [Small Vehicles] *in part*, to be entitled to overtime." *Id.* at *4 (emphasis included)(citing *Bedoya v. Aventura Limousine & Transp. Serv., Inc.,* No. 11-24432-CIV., 2012 WL 3962935, at *4 (S.D. Fla. Sept. 11, 2012)).

Other courts that have addressed the TCA have also found it applies when an employee drives both Small Vehicles and Large Vehicles. *See, Garcia v. Western Waste Servs., Inc.,* No. 1:12-CV-00597-BLW, 2013 WL 4735588, at *6 (D. Idaho Sept. 3, 2013) (In a case involving a trash and waste material disposal company, the court found that the plain language of the TCA demands that the focus be on the time spent on Small Vehicles, rather than the time spent on Large Vehicles and, therefore, if an employee was working on Small Vehicles for more than a *de minimis* portion of the time the TCA required the payment of overtime.); *Botero v. Commonwealth Limousine Serv., Inc.,* No. 12-10428-NMG, 2013 WL 3929785, at *12-13 (D. Mass. July 25, 2013) (In a limousine transportation company case, the court a) analyzed U.S. Dep't of Labor Wage & Hour Division Fact Sheet #19 issued 2009 (covering the Small Vehicle exception to the MCA Exemption) and the Field Assistance

---

[14] The manner in which the Plaintiffs contend the TCA should be applied is also supported by the Department of Labor in its U.S. Dep't of Labor Wage & Hour Division Fact Sheet #19 issued 2009 (covering the Small Vehicle exception to the MCA Exemption). [App. 34-35].

Bulletin, adopted the *de minimis* test, and found that employees were entitled to overtime if they worked more than a *de minimis* amount on vehicles weighing 10,000 pounds or less, and b) found the Fact Sheet #19 and the Field Assistance Bulletin to be consistent with the statutory language and persuasive.); *O'Brien v. Lifestyle Transp., Inc.* 956 F.Supp.2d 300, 306-07 (D. Mass. 2013) (In a limousine transportation company case, the court determined there was a plausible argument that the plaintiff was a "covered employee" under the TCA because of evidence he drove Small Vehicles and, therefore, defendant's motion to dismiss was denied.); *Santana v. Lykes Exclusive, LP*, No. 12-22013-CIV, 2013 WL 1001850, at *3 (S.D. Fla. Mar. 13, 2013) (In a transportation company case, the court cited the Field Assistance Bulletin  and analyzed whether the plaintiffs drove vehicles weighing 10,000 pounds or less and, therefore, were covered by the Small Vehicle exception to the MCA Exemption.); *Westberry v. William Joule Marine Transp., Inc.,* No. 8:12-CV-486-T-30TGW,  2013 WL 656327, at *3-5 (M.D. Fla. Feb. 22, 2013) (In a transportation company case involving 18-wheeler semi-trucks and escort vehicles weighing 10,000 pounds or less, the court a) quoted *Hernandez v. Alpine Logistics, LLC,* No. 08-CV-6254T, 2011 WL 3800031, at *4 (W.D.N.Y. Aug. 29, 2011) and repeated that the TCA "explicitly amended the FLSA to provide that drivers who meet the definition of a covered employee would be entitled to overtime compensation regardless of whether or not the Transportation  [Secretary] had jurisdiction to regulate the hours in condition of those drivers," and b) found that his decision was consistent with the  Field Assistance Bulletin and ruled the plaintiffs were entitled to overtime.); *Bedoya v. Aventura Limousine & Transp. Serv., Inc.,* No. 11-24432-CIV., 2012 WL 3962935, at *4 (S.D. Fla. Sept. 11, 2012) (In a limousine transportation company case, the court emphasized that "an employee's work need only *in part* involve the operation of noncommercial vehicles to be entitled to overtime," and that "if more than a *de minimus* portion of . . . [the employee's] work involved driving noncommercial vehicles, he is eligible for overtime under the FLSA as a 'covered employee.'"(emphasis included)(citations omitted));

*Hernandez v. Alpine Logistics, LLC,* No. 08-CV-6254T, 2011 WL 3800031, at *5 (W.D.N.Y. Aug. 29, 2011) (In a delivery service company case, the court found that a)the majority of the driving hours were spent driving vehicles weighing 10,000 pounds or less, and b) the TCA was clear and incontrovertible such that the "notwithstanding" language of the TCA required that the employees receive overtime.); *Mayan v. Rydbom Express, Inc.,* No. Civ.A.07-2658, 2009 WL 3152136, at *9 (E.D. Penn. Sept. 30, 2009) (In a delivery service company case, the court stated that employees may still qualify for overtime even if part of their duties involve commercial motor vehicles [Large Vehicles] and stressed the "in whole or in part" language of the TCA.).

### ii.  The Opposite View: Courts Holding That the TCA Should Not Apply

In contrast to the cases cited above, a Maryland District Court held "that the motor vehicle exemption should apply so long as the time an employee spends operating commercial motor vehicles [i.e. vehicles that weigh more than 10,000 pounds] is more than de minimus." *Avery v. Chariots for Hire,* 748 F.Supp.2d 492, 500 (D.Md.2010).  The *Avery* court reasoned that this is the appropriate approach because to do otherwise would place a mixed fleet employer in the untenable position of having its drivers fall under the simultaneous jurisdiction of both the Department of Labor and the Department of Transportation for weeks during which a driver operates two different classes of vehicles. *Id.*

An armored car case held the TCA not applicable. See, *Jaramillo v. Garda, Inc.,* No. 12 C 662, 2012 WL 4955932, at *3-6 (N.D. Ill. Oct. 17, 2012). *Jaramillo,* however, is distinguishable from the current case because it was decided based on Seventh Circuit Court of Appeals precedent (disallowing dual jurisdiction between the Department of Transportation and the Department of Labor) which should no longer be applicable. *Jaramillo* at *4 (relying upon *Collins v. Heritage Wine Cellars, LTD.,* 589 F.3d 895, 901 (7th Cir. 2009) for the "proposition that allowing dual jurisdiction on drivers would require burdensome record-keeping, create confusion, and give rise to mistakes

and disputes.").   The decision in *Collins* which the district court found controlling, however, did not concern the TCA, and dealt with facts that arose before the enactment of the 2008 TCA in which Congress specifically provided for dual jurisdiction. *See generally, Collins v. Heritage Wine Cellars, LTD.,* No. 07-CV-1246, 2008 WL 5423550, *1, *19-20 (N.D.Ill. Dec. 29, 2008) (action was filed in district court on March 5, 2007 and, therefore, district court analyzed facts under the provisions of SAFETEA-LU)

Additionally, in *Jaramillo,* 21 of the 34 plaintiffs had driven Large Vehicles over 80% of the time.  In the current case, 82.5% of Defendant Trinity's vehicles are Small Vehicles; the school route drivers drive Small Vehicles 99% of the time; and the Plaintiffs who drive armored vehicles drive the armored vehicles weighing 10,000 pounds or less (Small Vehicles) on a combined basis 69% of the time.

Thus, the current case is much more analogous to the armored car case of *McMaster* which was not decided under outdated court of appeals precedent and in which the use of Small Vehicles was approximately equal to the use of Large Vehicles.

Plaintiffs submit that the arguments of the other courts are also unpersuasive: they are inconsistent with the plain language and purpose of the TCA. While the TCA restored the DOT's regulatory jurisdiction under the MCA to its pre-SAFETEA-LU scope, *Allen v. Coil Tubing Services, LLC*, 846 F.Supp.2d 678, 692 (S.D.Tex.2012), it also included provisions which protected employees from the MCA exemption so they would continue to enjoy the protection of the FLSA. *Id.*; Pub. L. 110–244, § 306(a), 122 Stat. at 1620. The TCA expressly recognized that covered employees would receive compensation under the FLSA even though they were under the jurisdiction of the Department of Transportation. This is abundantly clear from the language of the statute providing that an employee who works on Small Vehicles, "**in whole or in part**," is not covered by the MCA exemption. Thus, the focus should be on the time spent with Small Vehicles,

rather than the time spent on commercial vehicles. *Garcia v. Western Waste Servs., Inc.,* No. 1:12-CV-00597-BLW, 2013 WL 4735588, at *6 (D. Idaho Sept. 3, 2013).   Moreover, this approach is consistent with the more general view that the MCA exemption is to be construed narrowly against the employer.

Finally, courts "have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 844 (1984). The Field Assistance Bulletin is consistent with the statutory language and is persuasive.  *See Botero v. Commonwealth Limousine Serv., Inc.,* No. 12-10428-NMG, 2013 WL 3929785, at *12-13 (D. Mass. July 25, 2013).

Given the distinguishing factors in the cases that hold the TCA does not apply, Plaintiffs submit that the more reasoned view and the view that is consistent with that of the Department of Labor is that the TCA applies to the current case.

## V.

## CONCLUSION

For the foregoing reasons Plaintiffs respectfully request that this Court grant Plaintiffs' Motion for Partial Summary Judgment and find that as a matter of law:

- Defendant West is an "employer" under the FLSA;

- Plaintiffs Pearson and Martin do not qualify for the "administrative" exemption under the FLSA and are required to be paid overtime under the FLSA;

- The motor carrier act exemption contained in the FLSA, 29 U.S.C. § 213(b)(1) does not apply to the employees of Defendant who work in the vault and such employees are required to be paid overtime under the FLSA; and

- The TCA applies to the drivers of Defendant Trinity's vehicles and negates the MCA Exemption in weeks in which the drivers operate vehicles weighing 10,000 pounds or less (vehicles 23, 102, 106, 109, 115-135 and 21, 22, 107 (prior to July 2012), 108, 110, 112, 113, 114 and 136) and such employees are required to be paid overtime under the FLSA.

Plaintiffs also respectfully request that this Court grant Plaintiffs' No Evidence Motion for Partial Summary Judgment and find that as a matter of law Defendants did not and cannot produce admissible evidence to support the facts necessary to establish that:

- Defendants are a carrier whose transportation of property by motor vehicle is subject to the Secretary of Transportation's jurisdiction; and

- Defendants acted in "good faith" and had "reasonable grounds" to believe their actions complied with the FLSA so as to negate the possibility of liquidated damages.

Respectfully submitted:

The Law Office of Chris R. Miltenberger, PLLC

By:      /s/ *Chris R. Miltenberger*

Chris R. Miltenberger
Texas State Bar Number 14171200

1340 N. White Chapel, Suite 100
Southlake, Texas 76092
817-416-5060 (office)
817-416-5062 (fax)
chris@crmlawpractice.com

Attorney for Plaintiffs

### CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record, who have consented in writing to accept this "Notice" as service of this document by electronic means.

By:      /s/ Chris R. Miltenberger

Chris R. Miltenberger